UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
(Western Division)

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| GKS CORPORATION | ) | |
| | ) | Case No. 19-30998-EDK |
| Debtor. | ) | |
| | ) | |

### DISCLOSURE STATEMENT REGARDING
### JOINT LIQUIDATING PLAN OF DEBTOR AND
### OFFICIAL COMMITTEE OF UNSECURED CREDITORS
### <u>DATED JANUARY 11, 2021</u>

Submitted herewith for approval by this Court is the Proposed Disclosure Statement

Regarding Joint Liquidating Plan of Debtor and Official Committee of Unsecured Creditors

dated January 11, 2021.

Dated: January 11, 2021

OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF GKS CORPORATION
By its attorneys,

GKS CORPORATION

By its attorneys,


*/s/ Gary M. Weiner\**
Gary M. Weiner (BBO#548341)
Weiner Law Firm, P.C.
1441 Main Street, Suite 610
Springfield, MA 01103
Tel: 413-732-6840
Email: gweiner@weinerlegal.com

*/s/ A. Davis Whitesell*
Michael J. Goldberg (BBO#551869)
A. Davis Whitesell (BBO#551462)
Hanna J. Ciechanowski (BBO#705222)
CASNER & EDWARDS, LLP
303 Congress Street
Boston, MA 02210
Tel:  (617) 426-5900
Email:  whitesell@casneredwards.com

* In  accordance with MLBR Appendix 8, Rule 8(b)(2), Attorney Whitesell represents that he
has been authorized by Attorney Weiner to submit Mr. Weiner's signature to this document.

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
(Western Division)

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| GKS CORPORATION | ) | |
| | ) | Case No. 19-30998-EDK |
| Debtor. | ) | |

**[PROPOSED]**
**DISCLOSURE STATEMENT REGARDING**
**JOINT LIQUIDATING PLAN OF DEBTOR AND**
**OFFICIAL COMMITTEE OF UNSECURED CREDITORS**
**<u>DATED JANUARY 11, 2021</u>**

## I.    INTRODUCTION

GKS Corporation (the "Debtor") and the Official Committee of Unsecured Creditors (the "Committee") have jointly filed the Liquidating Plan of the Debtor and the Official Committee of Unsecured Creditors dated January 11, 2021 (the "Plan"). A copy of the Plan is attached as Exhibit 1. All capitalized terms used herein shall have the meaning assigned in the Plan unless otherwise defined herein.

The Debtor provides this Disclosure Statement pursuant to Section 1125 of the United States Bankruptcy Code, to all of the known creditors of the Debtor. The purpose of this Disclosure Statement is to provide adequate information so that creditors entitled to vote on the Plan may make an informed voting decision.

The Plan is a liquidating plan, and does not contemplate the financial rehabilitation of the Debtor or the continuation of its business. Substantially all of the Debtor's assets have been sold since the commencement of the Debtor's Chapter 11 case, and the Plan contemplates that the net sale proceeds, together with the proceeds of remaining unliquidated assets (primarily potential causes of action of the bankruptcy estate), if any, will be distributed to the Debtor's creditors holding allowed claims against the bankruptcy estate in the manner set forth in the Plan. The Debtor anticipates, based on the amount of claims filed to date and the amount of cash currently held by the Debtor, that *the dividend to general unsecured creditors is likely to be in the range of __ to__  percent.* The dividend ultimately paid will depend on the manner in which unresolved and disputed claims are resolved and allowed, and the magnitude of expenses incurred in implementing the Plan and winding up the bankruptcy estate. Holders of the Debtor's equity interests will retain their equity interests, but will not receive any distributions on account of such equity interests unless and until all creditors' claims are paid in full, which is extremely unlikely to happen.

The Plan provides for an initial distribution to general unsecured creditors to be made promptly after the Effective Date. The Debtor currently anticipate that an initial distribution is likely to be made by March 31, 2021; the amount of the initial distribution will depend on whether disputed claims have been resolved by then and the manner in which they have been resolved.

The liquidation of the Debtor's estate, and the benefit to general unsecured creditors derived therefrom, has been accomplished principally through a sale of the Debtor's business enterprise, the real property and improvements known and operated as The American Inn for Retirement Living located at One Sawmill Park, Southwick Massachusetts (the "Community"). The Debtor sold the Community on November 23, 2020 to Southwick Care, LLC, the nominee of Triple M Investments ("Purchaser") for $19.2 million. Pursuant to the Bankruptcy Court order authorizing the sale, approximately $5,900,000 of gross sale proceeds were used to pay transaction-related expenses, as well as the claims of certain secured creditors including Westfield Bank, which held a mortgage lien against the Community, and the Town of Westfield,

2

which held tax liens.  The Debtor received approximately $13.3 million of net sale proceeds and is holding those funds, which will be used to fund the Plan distributions to creditors.

A ballot for your use in voting to accept or reject the Plan is enclosed.  Instructions for completing and returning the ballot are printed on the ballot itself.  IN ORDER FOR YOUR BALLOT TO COUNT, IT MUST BE RECEIVED BY THE DEBTOR'S COUNSEL AT THE ADDRESS STATED ON THE BALLOT NO LATER THAN 5:00 P.M. (Boston time) ON _____, 2021.

**THE CREDITORS' COMMITTEE, WHICH WAS APPOINTED BY THE UNITED STATES TRUSTEE TO REPRESENT THE INTERESTS OF ALL GENERAL UNSECURED CREDITORS, IS A CO-SPONSOR OF THE PLAN, AND RECOMMENDS THAT YOU VOTE TO ACCEPT THE PLAN**.

EXCEPT WHERE SPECIFICALLY STATED OTHERWISE, THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS BASED UPON INFORMATION SUPPLIED BY THE DEBTOR.  THE DEBTOR HAS DONE ITS BEST TO ASSURE THAT THE INFORMATION IS CORRECT AND COMPLETE, BUT IT IS IMPOSSIBLE TO REPRESENT THAT THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS WITHOUT ERROR.

NO REPRESENTATIONS CONCERNING THE DEBTOR OR THE PLAN ARE AUTHORIZED OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. ALTHOUGH THIS DISCLOSURE STATEMENT DESCRIBES THE PLAN IN SUMMARY AND IN DETAIL, IT IS RECOMMENDED THAT YOU REVIEW THE PLAN ITSELF FOR A DEFINITIVE UNDERSTANDING OF ITS TERMS.

## II.     BACKGROUND OF THE DEBTOR AND EVENTS LEADING TO CHAPTER 11

### A.     THE DEBTOR'S BUSINESS

The Debtor was formed on July 15, 2002 as a Massachusetts for-profit corporation.  The Debtor's principal asset is the Community, located on a 46-acre campus (herein, the "Real Property"; where appropriate, references to the Community herein include the Real Property) in Southwick, Massachusetts, approximately 10 miles west of Springfield, Massachusetts.  The Debtor operates the Community as a senior living facility consisting of a main building with independent and assisted living apartments and dining, recreation and other facilities, and cottages providing independent living arrangements for adults 55 and older.

The Debtor's two owners are Michael B. Guarco, Sr. and Dorina G. Konopka (together, the "Owners"), who also serve as its two directors.  Mr. Guarco is the President and Treasurer of the Debtor.  As of August 9, 2019, the Owners agreed that One Point Partners, LLC ("One Point") would assume responsibility for day-to-day operational and financial management of the

Debtor and the Community pursuant to a management agreement between the Debtor and One Point. The Owners retained approval rights over major decisions affecting the Debtor, including the filing of the Debtor's voluntary petition commencing the Debtor's Chapter 11 case, which was authorized by the Owners in their capacity as directors, officers and shareholders of the Debtor.

Altogether, the Community consists of 187 living units. 129 of these are independent living cottages, approximately half of which are one-bedroom units and the other half being two-bedroom units. In addition to the cottages, the Community's main building—known as "The Crane Building"—contains 40 apartments (most of which are one-bedroom units) and 18 assisted-living units. The Crane Building also contains dining rooms, a library, function rooms, recreational facilities, and the Community's executive offices.

Except with respect to the assisted living units, the Community operated as an "entrance fee" facility. Historically, when someone moved into the Community, he or she executed a "Residency Agreement" governing the services that the resident was entitled to receive as a member of the Community and providing for an up-front payment by the resident. Historically, these up-front payments ranged from $139,000 to $241,000 for Crane Building apartments, from $160,000 to $246,000 for one-bedroom cottages, and from $194,000 to $295,000 for two-bedroom cottages. Under the form of Residency Agreement that was typically utilized by the Community, 10 percent of the up-front payment was typically denoted an "entrance fee." The Debtor earned the right to retain this entrance fee at the rate of 10 percent per month, such that the entrance fee was fully earned and non-refundable after ten months. The balance of the resident's up-front payment (i.e., the portion not constituting the entrance fee) was treated as a loan by the resident to the Debtor (a "<u>Resident Loan</u>") that the Debtor was required to repay after the resident moved or passed away. The Debtor's Resident Loan repayment obligation was evidenced by the Debtor's promissory note issued to the resident (a "<u>Resident Note</u>"). Typically, a Resident Note calls for the underlying Resident Loan to be repaid on the date which is the earlier of (i) the date the departing resident's unit is occupied by a new resident, or (ii) one year after the resident has left the unit, although some of the Resident Notes provide for a longer period of time before the Resident Loan must be repaid. In addition to the up-front payments collected from the Community's residents, residents also pay a monthly fee for services rendered by the Debtor, which include landscaping, snow removal, emergency call system, and other personal services.

### B.    EVENTS LEADING TO CHAPTER 11

For the typical entrance fee community that has achieved "stabilization," the up-front payments collected from new residents are sufficient to fund the community's obligations to repay such deposits to departing residents, while monthly fees collected from residents cover the costs of operating the facility. However, when occupancy levels at a community suffer a prolonged decline, that community is likely to encounter financial difficulties.

Declining occupancy levels at the Community have been a principal cause of its financial difficulties. As of December 26, 2019, when the Debtor commenced its Chapter 11 case (the "Petition Date"), the Debtor owed $9,083,698 to former residents, their estates or assignees (collectively, the "Refund Claims"). As of the same date, 38 independent-living cottages and 22 apartments in the Crane Building were vacant, putting continued pressure on the Debtor's ability to meet its expenses of operation. As of the Petition Date, payments on account of Refund Claims had not been made for over 18 months.

In addition, the Debtor's financial difficulties had become generally known in the surrounding community, and significantly impaired its ability to attract new residents. In fact, after January 1, 2019 only three new residents have moved into the Community, and there have been no new residents since the Petition Date.[1] The Debtor's cash flow difficulties, in turn, led to the deferral of numerous maintenance items, further hampering the Community's marketing efforts.

## III.   THE CHAPTER 11 CASE

The Debtor filed its voluntary petition commencing its Chapter 11 case on December 26, 2019. The Chapter 11 case provided the Debtor with a stable operating environment for the Community while it pursued its restructuring effort, including through the proposed sale of the Community. Having now completed the successful sale of the Community—at a sale price far higher than the Debtor expected when if filed its Chapter 11 case—the Debtor has proposed the Plan as the means to complete the administration of the Debtor's Chapter 11 case and distribute the remaining proceeds of sale to the Debtor's creditors.

### A.      CHIEF RESTRUCTURING OFFICER

As noted above, on August 9, 2019, the Debtor entered into a Management Services and Financial Advisory Agreement with One Point, pursuant to which One Point would provide management services to the Community, and provide financial advisory services through the efforts of Toby Shea, as Chief Restructuring Officer ("CRO") and Jamie Spencer, as Chief Financial Officer ("CFO"). Upon the filing of its Chapter 11 case, the Debtor sought approval to retain One Point to continue to provide these services. The Debtor's motion was initially opposed by the United States Trustee, who also filed a motion seeking to appoint a Chapter 11 trustee pursuant to Bankruptcy Code Section 1104(a); when the Bankruptcy Court denied the United States Trustee's motion, the Debtor, One Point and the United States Trustee were able to

---

[1] The three residents who moved into the Community in 2019 did so based on an arrangement under which 90% of their entrance fees would be deposited in escrow held by a third-party escrow agent. Under the terms of the escrow agreements executed by these three residents, the entrance fee would be returned to the residents unless the buyer of the Community agreed to assume responsibility for refunding the deposits in accordance with the terms of the applicable residency agreements. Since the Purchaser did not agree to assume that obligation, the escrowed entrance fees paid by these three residents were returned to them in connection with the closing of the sale of the Community.

resolve the issues surrounding One Point's retention, resulting in the entry of an order approving
One Point's engagement on February 19, 2020 [Docket No. 75].

Throughout the course of the Debtor's Chapter 11 case, One Point has continued to
provide management and financial advisory services on a broad range of operational and
financial issues, and played a critical role in connection with the negotiations with ValStone
Partners, LLC, whose special-purpose entity VS Southwick, LLC became the "stalking horse"
bidder for the Community, as well as other bidders, resulting in its eventual sale.

## B.      CREDITORS' COMMITTEE

Since it is usually impractical for unsecured creditors to participate directly in a Chapter
11 case, bankruptcy law provides for an official committee of unsecured creditors (which usually
selects and is represented by counsel compensated by the bankruptcy estate) to represent the
interests of the unsecured creditors as a group.  The membership of the creditors' committee
typically includes the largest unsecured creditors who are willing to serve, provided that they are
representative of the creditor body.  The committee is appointed by the United States Trustee, a
federal official with administrative responsibilities in bankruptcy cases.  Once appointed, a
creditors' committee will typically play an active role in the Chapter 11 case, including to
oversee the administration of the bankruptcy estate, to monitor the debtor's business operations,
to evaluate any planned disposition of estate assets, to negotiate with the debtor and its secured
creditors regarding any proposed Chapter 11 plan, and otherwise to provide its views on other
issues in this case

On January 22, 2020, the United States Trustee appointed the official committee of
unsecured creditors in the Debtor's Chapter 11 case (the "Committee").  The Committee as
appointed included the following five members, four of whom, at the time of their appointment,
were current Community residents and one whose parent was a current Community resident:

Tilia J. Fantasia
15 Morningside Road
Southwick, MA 01077

Louise Brassard
74 Sawmill Park
Southwick, MA 01077

Paul Breveleri
PO Box 12
Agawam, MA 01001

6

Glen Ebisch
8 Morningside Road
Southwick, MA 01077

Latimer Eddy
47 Sawmill Park
Southwick, MA 01077

Since the Committee's appointment, one of its members, Louise Brassard, has passed away. In
Ms. Brassard's stead, Julia Fiore, a current resident of the Community, was added to the
Committee on September 23, 2020, with her son Richard "Dick" Fiore acting as her agent.

The Committee retained Gary M. Weiner, Esq. and his firm, Weiner Law Firm, P.C., as its
counsel to represent the Committee and its constituents' interests in the Chapter 11 case.

## C.    POSTPETITION FUNDING

When it filed its Chapter 11 case, the Debtor had no means of paying for ongoing
expenses of operating its business and preserving and protecting its assets during its Chapter 11
case except through the use of funds in which the Bank claimed an interest as cash collateral
(e.g., proceeds of the Debtor's accounts receivable). Accordingly, when the Debtor filed for
bankruptcy, it filed a motion seeking approval of financing arrangements agreed to with the
Bank prior to filing. These arrangements included the Bank's agreement (i) to permit the
Debtor's use of the Bank's cash collateral and (ii) to provide a first priority secured debtor-in-
possession loan up to a maximum amount of $900,000 (the "DIP Loan"), in each case for the
Debtor's payment of necessary costs and expenses substantially in accordance with the budget
attached to the financing motion (including as such budget may be updated with the Bank's
approval, the "Budget"). In accordance with this arrangement and the Debtor's financing
motion, the DIP Loan was advanced pursuant to and is subject to the terms and conditions of the
loan agreement between the Debtor and the Bank attached to the Debtor's financing motion (the
"DIP Loan Agreement"). After a preliminary hearing, the Bankruptcy Court approved these
financing arrangements on an interim basis sufficient to enable the Debtor to operate in the
ordinary course pending the Court's final consideration of the financing arrangements. On
January 24, 2020, the Court approved the financing on a conditional, final basis and its order
became effective as a final order on February 8, 2020 (the "DIP Financing Order").

The financing arrangements created by the DIP Loan Agreement and authorized and
approved by the DIP Financing Order enabled the Debtor to maintain ongoing business
operations and critical resident care without disruption. Among other things, DIP Loan
proceeds, together with cash flow from operations, have funded payment of employee wages and
benefits, the procurement of goods and services integral to the Debtor's ongoing business
operations, other normal course working capital needs, and payments of other Chapter 11

7

administrative expenses including payments to the Debtor's professional advisers and to counsel to the Creditors' Committee.

The original DIP Loan Agreement, entered into when the Debtor was contemplating a plan of reorganization to be filed by April 2020, covered the Debtor's projected financing needs through June 30, 2020.  With the change of approach to a possible sale of the Community (discussed in Section III.E, below), followed by the solicitation process for a stalking horse bidder, the time frame for the Debtor's Chapter 11 case, and the concomitant need for financial support of its restructuring effort, was necessarily extended.  Consequently, the Debtor in May 2020 approached the Bank about extending the duration of the existing post-petition financing arrangements authorized by the DIP Financing Order, and increasing the amount of the DIP Loan, to accommodate the sale process.

After discussions and negotiations between the Bank and the Debtor, the Bank agreed, pursuant to an amendment to the DIP Loan Agreement, to permit the Debtor's continued use of the Bank's cash collateral and to make up to $380,000 of additional secured post-petition financing available to the Debtor, all for the purposes and in the amounts set forth in the Debtor's updated budget attached to the amended DIP Loan Agreement.  The supplemental financing, which was extended through September 30, 2020, enabled the Debtor to meet payroll, pay utilities, undertake critical capital expenditures, and pay its other operating and administrative expenses while it pursued its sale effort.  The Debtor filed its motion seeking approval of the supplemental financing on June 5, 2020, and the Bankruptcy Court granted the motion and approved the supplemental financing by order entered June 23, 2020.

As is described below, the process by which the Debtor sold the Community reached fruition with the entry of an order of the Court approving the sale to the Purchaser.  At the same time, to facilitate the closing of the sale of the Community, the Debtor requested a further extension of its use of the Bank's cash collateral through November 30, 2020, and additional loan advances from the Bank of up to $350,000.  The Bankruptcy Court approved this request on October 17, 2020.  The supplemental financing proved sufficient to fund the Debtor's operations and Chapter 11 administrative expenses through the closing of the sale of the Community on November 23, 2020; at closing, the proceeds of the sale were used to pay all DIP Loan advances, plus interest thereon, in full.

### D.    OTHER MATTERS

Chapter 11 administrative matters requiring the attention of the Debtor and the Bankruptcy Court have included the Court's approval of the Debtor's engagement of its restructuring professionals to assist and guide the Debtor through the bankruptcy process, the Court's appointment of a patient care ombudsman ("PCO") to oversee the Debtor's provision of care to the Community's assisted living residents, the Debtor's arrangements to obtain and pay for necessary insurance, and arrangements governing the payment of compensation to all estate professionals (the Debtor's professionals, counsel to the Creditors' Committee, and the PCO and

her counsel).  All of these matters are typical to a bankruptcy case such as the Debtor's and all of the matters have been addressed in a straightforward, effective manner.

### E.      SALE EFFORTS, APPROVAL AND CLOSING

On commencing the Chapter 11 Case, the Debtor intended to file a plan of reorganization that involved a conversion of the cottages located at the Community to condominium units, and the operation of the main building located on the Real Property—the "Crane Building"—as a rental facility.  The plan, in conceptual form, would have used proceeds from the sale of unoccupied units to finance operational requirements, debt service payments to the Bank and start-up capital for an update of the Community's physical plant.

The Debtor's intention to file a plan was based, in large part, on its prepetition inability to procure a buyer for the Community, an inability that the Debtor believed stemmed from a need to refresh and repurpose the Community before it could attract potential acquirers.  Nevertheless, at the request of the Bank and with the support of the Committee, the Debtor (with Court approval) retained the services of Cushman & Wakefield ("C&W"), a well-known senior living broker, to explore possible sale options for the Community.

Upon the Bankruptcy Court's approval of its engagement, C&W commenced its initial marketing effort directed toward soliciting prospective purchasers' interest in acquiring the Community and in potentially serving as a stalking horse bidder in a bankruptcy sale process.  At the same time, VS Southwick contacted One Point to express VS Southwick's significant interest in acquiring the Community.[2]  With the assistance of C&W, the Debtor negotiated a letter of intent with VS Southwick, which was executed on April 2, 2020.  The efforts of the Debtor and C&W then turned to management of VS Southwick's due diligence process and the negotiation of an asset purchase agreement (the "VS APA"), which was executed on July 20, 2020.  Among its terms, the VS APA provided for a purchase price for the Community of $9,000,000.  The VS APA also provided that the Community would no longer require the payment entrance fees, and that rents to be charged Community residents would increase above their current levels.  To address the impact of such rent increases on the Community's current residents (the "Current Residents"), the VS APA also offered an abatement of rent, to be allocated among the Current Residents, totaling $4,000,000 (the "Rent Abatement").  Promptly upon the execution of the VS APA on July 20, 2020, the Debtor filed two motions: (i) a Motion for Authority to Sell Substantially All Assets Including Certain Executory Contracts Pursuant to Sections 363 and 365 of the Bankruptcy Code, Free and Clear of Liens, Claims, and Interests [Docket No. 119] (the "Sale Motion"), and (ii) a Motion for an Order (A) Approving Procedures Governing Proposed Sale of Substantially All Assets Including Certain Executory Contracts Pursuant to Sections 363 and 365 of the Bankruptcy Code Free and Clear of Liens, Claims, and Interests; (B) Approving

---

[2] VS Southwick first contacted the Bank, who referred VS Southwick to One Point to explore the possibility of VS Southwick's acquisition of the Community.

Form and Manner of Notice of Sale; and (C) Granting Related Relief [Docket No. 120] (the "Sale Procedures Motion").

As a bankruptcy sale, the Debtor's proposed sale of the Community to VS Southwick was required to be submitted to a process designed to elicit competing offers, to ensure that the proposed sale was the highest and best available to the Debtor's estate.  By the Sale Procedures Motion, the Debtor sought the Bankruptcy Court's approval by which competing bids would be solicited, through the combined efforts of C&W, One Point, and the Debtor's professionals.  The Bankruptcy Court approved the Sale Procedures Motion by order entered on July 30, 2020 [Docket No. 143] (the "Sale Procedures Order").  Among its provisions, the Sale Procedures Order set a deadline of September 18, 2020 for the submission of competing bids for the Community; if any qualified bids were received by the deadline, required the conduct of an on-line auction on September 23, 2020; and set September 30, 2020 as the date for the hearing to approve the proposed sale of the Community (the "Sale Hearing").

As is typical for a bankruptcy sale involving a "stalking horse" bidder – i.e., one whose initial bid, like VS Southwick, is subject to competitive bidding process – the Sale Procedures Order provided that, if VS Southwick was not the highest bidder, then, upon the closing of a sale to another bidder, VS Southwick would receive a "break-up fee" equal to 4% of the purchase price in the VS Southwick APA, and the reimbursement of its transaction-related expenses of up to $200,000.

Upon entry of the Sale Procedures Order, C&W commenced its solicitation process by distributing a marketing "teaser" to over 5,000 investors, and by contacting over 1,000 companies identified as potential purchasers based on acquisition profiles developed by C&W.  As a result of these efforts, 112 parties executed confidentiality agreements; C&W maintained regular contact with these parties, providing access to a data room, sharing cash flow models and facilitating responses to specific questions of particular potential bidders.  Seven of these groups toured the Community as well.

C&W's efforts resulted in the submission of three competing bids to acquire the Community by Aspen Square Management, Elevation Financial Group, and Triple M Investments.  These bids were timely submitted and determined by the Debtor to constitute "Qualified Bids" pursuant to the Sale Procedures, entitling the three bidders and VS Southwick (collectively, the "Qualified Bidders") to participate in the auction to acquire the Community.

On September 23, 2020, the Debtor conducted by Zoom teleconference an auction of the Community pursuant to the Sale Procedures Order (the "Auction").  At the Auction, each Qualified Bidder made one or more bids to acquire the Community.  At the conclusion of the Auction, the Debtor in consultation with other parties pursuant to the Sale Procedures designated the $19.2 million bid of Triple M Investments to be the "Winning Bid" and the $19.15 million bid of Aspen Square Management to be the "Back-Up Bid".  Both the "Winning Bid" and the "Back-Up Bid" included a Rent Abatement totaling $4,450,000.

The closing of the sale to the Purchaser (as noted above, Southwick Care, LLC, the nominee of Triple M Investments) took place on November 23, 2020.  From the $19,200,000 purchase price, the following amounts, among others, were deducted and paid:

- $3,869,414.07, to the Bank, on account of its pre- and post-petition loans to the Debtor;
- $926,121.69, to the Town of Southwick, on account of pre- and post-petition real estate taxes due (subject to a credit to the Debtor in the amount of $46,497.74, for taxes due between closing and December 31, 2020;
- $16,321.04, to Wells Fargo Vendor Financial Services, on account of its pre-petition claim arising from the financing of certain equipment of the Debtor;
- $392,612.00, to C&W, for its brokerage commission and expenses;
- $557,576.17, to VS Southwick for its break-up fee and expense reimbursement;
- $35,979.21, in payments to cure defaults under contracts to be assigned to the Purchaser; and
- $87,027.60, in documentary excise taxes.

Concurrently with the closing, all employees of the Debtor were terminated; most were hired at the same time by the Purchaser.

### F.      BAR DATE

By order dated November 30, 2020, the Bankruptcy Court established a "bar date" deadline for creditors to file proofs of claim of January 15, 2021.  Notice of the bar date has been sent to all known creditors of the Debtor.  For further information concerning the process by which claims against the Debtor will be allowed or disallowed, see Section VI, "Allowance of Claims," below.

## IV.    ASSETS OF THE ESTATE

The Debtor holds approximately $_____ of cash as of _____, 2021.  The only other assets of the Debtor consist of potential causes of action arising under the Bankruptcy Code.

### A.      PREFERENTIAL TRANSFERS

The Bankruptcy Code permits a debtor's bankruptcy estate to avoid and recover certain transfers by the debtor, made within 90 days before the bankruptcy filing or, in the case of a transfer to an insider of the debtor, within one year before the bankruptcy filing.  In general terms, such a transfer can be recovered if it was made by an insolvent debtor, to or for the benefit of a creditor, on account of an antecedent debt, and the transfer allowed the creditor to receive more than it would have in a Chapter 7 liquidation.  However, the Bankruptcy Code also

provides various defenses to recipients of such transfers.  An otherwise preferential transfer is excepted from recovery if, for example, the transfer was made in the ordinary course of business, or the creditor receiving the transfer provided the debtor with new value (such as additional products or services) after the transfer.

The Debtor has identified one preferential transfer, the recording of an attachment by one creditor within 90 days before the Petition Date purporting to elevate the creditor's unsecured claim to a secured claim, discussed in Section IV.C.1.b, below.  Under the Plan, the Plan Committee (comprised of the current members of the Creditors Committee, and represented by Gary M. Weiner) will serve as estate representative with the ability to identify any potential preference actions and to commence and pursue to judgment (or other resolution) any identified preference actions. Aside from the preferential attachment, the Debtor is not aware of any preferential transfers.

### B.    FRAUDULENT TRANSFERS

The Bankruptcy Code and state law also permit a debtor to recover fraudulent transfers. There are two categories of transfers which could be fraudulent: first, in general terms, transfers made for less than reasonably equivalent value while the debtor was in financial distress; and second, transfers made by the debtor with actual intent to hinder, delay or defraud its creditors. The Debtor does not believe that it has made any fraudulent transfers.  Under the Plan, the Plan Committee will serve as estate representative with the ability to identify any potential fraudulent actions and pursue to judgment (or other resolution) any identified preference actions.

### C.    OTHER POTENTIAL ACTIONS

The Committee has informed the Debtor that it is investigating the possibility that creditors (acting through the Plan Committee) may have possible causes of action (i) against certain current and/or former officers, directors and shareholders of the Debtor to subordinate certain claims held by such individuals and (ii) against such individuals on account of alleged prepetition mismanagement of the Debtor's business and financial affairs.  Any such actions will be undertaken by the Plan Committee, represented by Attorney Weiner, pursuant to the Plan.  It is not certain whether the Committee will determine the existence of any such claims, or whether the Plan Committee would be successful in asserting any such claims.  Consequently, it is not certain that there will be any claims actually asserted or, if claims are asserted, whether there would be any recovery for creditors.

## V.      DESCRIPTION OF THE PLAN

### A.      INTRODUCTION

The following description of the Plan is only a summary.  Creditors are urged not to rely on this summary but to carefully read the Plan in full.  When confirmed, the Plan will be binding upon the Debtor's creditors and other affected entities.

### B.      SUMMARY OF THE PLAN

The Plan provides for a Plan Administrator to assume possession and control of the Debtor's remaining assets (other than causes of action under the Bankruptcy Code, which will be controlled by the Plan Committee).  The Plan Administrator will administer such assets (principally cash) for the benefit of the Debtor's creditors, object to claims that appear to be invalid or overstated (and prosecute objections to claims filed by the Debtor, the Plan Committee and/or the Plan Administrator prior to confirmation of the Plan), and make distributions to creditors on account of their allowed claims against the Debtor.[3]  The Debtor has ceased all business operations and has liquidated virtually all of its property.  The Debtor's principal asset is approximately $_____ of cash as of _____, 2021.  The remaining non-cash assets of the Debtor consist of potential claims against third parties, as described above.

The Plan places all general unsecured claims against the Debtor into a single class, Class Five.  The Debtor estimates that each holder of a Class Five Claim will receive a distribution in the range of ____ to ____ per cent of its allowed claim.  This estimate assumes that, as the Debtor believes will be the case, general unsecured claims allowed by the Bankruptcy Court will not exceed $30 million; the actual dividend will depend on the amount in which claims are ultimately allowed and the extent to which the bankruptcy estate is augmented through, for example, recoveries of avoidable transfers.  As noted, the Debtor is unable to predict with certainty the amount in which claims will ultimately be allowed.

The Plan proposes that Jamie Spencer, the Debtor's current interim Chief Financial Officer, would serve as the Plan Administrator.  Once the Plan is confirmed and the Plan Administrator is appointed, the Plan Administrator will complete the liquidation of the Debtor's remaining assets in collaboration with the Plan Committee and make distributions to creditors as provided for by the Plan.  The holders of the Debtor's stock will receive nothing on account of such equity interests, except in the extremely unlikely event that all creditors' claims are paid in full with interest.  Until all distributions are made and the Debtor's Chapter 11 case is closed, the Plan Administrator will prepare and file with the Bankruptcy Court quarterly reports concerning his administration of the estate.

---

[3] It is expected that the Plan Committee will have primary responsibility for filing objections to any claims filed or held by insiders of the Debtor.

### C.   LIABILITIES OF THE DEBTOR AND THEIR TREATMENT UNDER THE PLAN

The following is a summary of the liabilities of the Debtor and their treatment under the Plan:

#### 1.   Secured Claims

A claim is "secured" when a creditor holds a lien on particular assets ("collateral") to assure payment of the claim.   In general, proceeds from any sale of collateral must be applied first to the repayment of any claims secured by the collateral.  To the extent that the value of the collateral exceeds the principal amount of the secured claim, then the secured claim will include any interest or costs of collection that the debtor company agreed to pay.  If the amount of the claim exceeds the value of the collateral, then the claim is considered to be a "secured claim" under bankruptcy law only to the extent of the value of the debtor's interest in the collateral. Applicable bankruptcy law requires secured claims to be paid in full to the extent allowed.

Secured claims against the Debtor include the following:

#### a.   Satisfied Claims

Certain secured creditors received full payment of their secured claims upon the closing of the sale of the Community, including:  (i) Westfield Bank, which received $3,869,414.07 on account of its prepetition and post-petition secured loans to the Debtor;  (ii) the Town of Southwick, Massachusetts, which received $926,121.69 on account of outstanding real estate taxes and water and sewer charges; and (iii) Wells Fargo Vendor Financial Services LLC, which received $16,321.04 on account of its secured financing of certain items of the Debtor's equipment sold to Triple M.  Because these claims were satisfied upon closing of the sale, they are not addressed by the Plan.

#### b.   Attachments on the Real Property

Prior to the Petition Date, three former Community residents commenced litigation against the Debtor, resulting in attachments on the Real Property totaling $601,330 (the "Attachments").  Of the three Attachments, one, in the amount of $207,920 held by Martha Cousins, was obtained within 90 days prior to the Petition Date, and is therefore potentially susceptible to avoidance as a preferential transfer (see Section VI.A below); the Plan contemplates that this avoidable attachment will indeed be avoided, and the underlying claim treated as a general unsecured claim.  Under the Plan, each of the other two attachment claims (held by Steven Pirola and Donna J. Sullivan, and Steven J. Tynan as Trustee of the Carol E. Tynan Revocable Trust, are treated as secured claims to be paid in full on the Effective Date. The Plan classifies these two attachment claims in Class One and Class Two, respectively, and

treats each such claim as unimpaired; accordingly, each of Class One and Class Two is deemed to accept the Plan.

### c.  Konopka Loan

On December 9, 2019, Dorina G. Konopka, one of the Debtor's owners, made a loan to the Debtor in the principal amount of $145,000 (the "Konopka Loan"). The Konopka Loan was secured by a mortgage on the Real Property and consequently Ms. Konopka's mortgage lien was transferred to the sale proceeds. Under the Plan, Ms. Konopka's secured claim, together with accrued interest, will be paid in full on the Effective Date. The Plan classifies Ms. Konopka's secured claim in Class Three, and treats such claim as unimpaired; accordingly, Class Three is deemed to accept the Plan.

### 2.  Priority Claims

The Bankruptcy Code entitles certain types of unsecured claims to be paid in full before any payment is made on other unsecured claims. These "priority claims" include expenses incurred for the benefit or on behalf of the Debtor's estate during the Chapter 11 case (including fees of professional persons), wages incurred within 90 days and employee benefits incurred within 180 days before the beginning of the Chapter 11 case (up to $13,650 per employee), and most unsecured taxes arising before the Chapter 11 case.

The Debtor anticipates that the following priority claims will be asserted:

### a.  Postpetition Claims

The Debtor has paid postpetition accounts payable arising from its operations in the ordinary course of its business. The attorneys and accountants employed by the Debtor and the Creditors' Committee also will hold administrative priority claims for services provided to the Debtor's estate since the Petition Date, as will One Point. Such claims will be paid pursuant to Bankruptcy Court order or as otherwise provided in the Plan. Also, the Debtor will be liable for quarterly fees payable to the United States Trustee pursuant to 28 U.S.C. §1930; outstanding fees will be payable on the Effective Date and additional payments will thereafter be due and payable until the Chapter 11 case is closed.

The following professionals have been retained in this case and, assuming an Effective Date under the Plan of March 15, 2021, are to hold administrative priority claims for services rendered and reimbursable expenses incurred during the Case in the following estimated amounts:

15

| Professional | Administrative Claim (Estimate) |
|---|---|
| Casner & Edwards, LLP<br>(Debtor's Bankruptcy Counsel) | $_____ |
| Calvin Annino, Esq.<br>(Debtor's Corporate Counsel) | $_____ |
| Whittlesey & Co.<br>(Debtor's Accountant) | $_____ |
| Gary M. Weiner, Esq.<br>(Creditors' Committee Counsel) | $_____ |
| Michele Feinstein, Esq.<br>(Patient Care Ombudsman) | $_____ |
| One Point Partners<br>(Chief Restructuring Officer and management services) | $_____ |

During the Chapter 11 case, Casner & Edwards, LLP has received, as of _____, 2021, interim compensation in the amount of $_____, through payments received from the Debtor. The $_____ amount shown above is the firm's estimated administrative claim is net of the $_____ already received. CWG still holds retainer funds in the amount of $10,000.00. During the Chapter 11 case, Calvin Annino has received interim compensation in the aggregate amount of $_____; Gary M. Weiner has received interim compensation in the aggregate amount of $_____; and Michele Feinstein has received interim compensation in the amount of $_____.

Apart from the professional fees described above, the Debtor knows of no unpaid Claims arising since the filing of its Chapter 11 petition on December 26, 2019. Any entity holding a Claim that arose on or after December 26, 2019 but prior to the Effective Date (whether or not such Claim is entitled to priority as an Administrative Claim) and who has not received payment for such Claim from the Debtor, must, to preserve such Claim and the holder's entitlement to receive a payment on account of such Claim, file a request for payment of such Claim with the Bankruptcy Court by the Administrative Claims Bar Date. **The Administrative Claims Bar Date is the 30th day after the Effective Date of the Plan**, which takes place on the second business day after the 14th day following confirmation of the Plan. If and when an Administrative Claim is allowed by Final Order of the Bankruptcy Court, the holder of such Claim will receive payment in full.

### b.      Prepetition Priority Claims

At the commencement of the case, the Debtor was obligated on account of employee compensation and benefit claims entitled to payment priority under Section 507(a)(3) and (4) of the Bankruptcy Code in the aggregate amount of approximately $39,000.  All of these priority claims have been paid during the Debtor's Chapter 11 case pursuant to Bankruptcy Court order authorizing the Debtor's payment of prepetition employee claims.

Certain tax claims are entitled to payment priority under Section 507(a)(8) of the Bankruptcy Code.  Pursuant to a proof of claim filed on January 28, 2020 [Claim No. 4-1], the Massachusetts Department of Revenue seeks payment of a priority claim in the amount of $7,100.15.  Pursuant to a proof of claim filed on February 26, 2020 [Claim No. 7-1], the Internal Revenue Service claims to be entitled to a priority claim of $8,032.75.  To the extent allowed, each of these  tax claims will be paid in full on the Effective Date.

### 3.      General Unsecured Claims

Unsecured claims not entitled to priority under the bankruptcy law are called "general unsecured claims."  If you supplied goods or services to the Debtor before December 26, 2019 (when the Debtor filed its Chapter 11 petition) and you have not been paid, then you probably hold a general unsecured claim.  All claims held by current and former residents of the Community arising out of entrance fees paid to the Debtor are treated as general unsecured claims under the Plan.

**Schedule 6.1 of the Plan sets forth a schedule of all of the claims of the current and former residents of the Community (collectively, the "<u>Residency Claims</u>"), and the amount that the Debtor and the Committee believe is the correct amount of each such Residency Claim.  In the absence of an objection to the Plan filed by any of the holders of the Residency Claims listed on Schedule 6.1 of the plan, each Residency Claim shall be deemed allowed in the amount set forth on the Schedule.**

The Plan provides for allowed general unsecured claims to be paid *pro rata* from funds held by the Plan Administrator after payment of administrative expenses and other priority claims.  The Debtor currently estimates that general unsecured claims will be allowed by the Bankruptcy Court in the amount of approximately $__ million, in line with the amount of general unsecured liabilities shown in the Debtor's schedule of liabilities filed with the Bankruptcy Court.  Based on these figures, the Debtor currently estimates that the ultimate dividend to general unsecured creditors will be __ to __ percent of their allowed claims; however, as noted, the dividend ultimately payable will depend on whether additional valid claims are successfully asserted by creditors filing proofs of claim by the January 15, 2021 bar date and the outcome of objections to claims and any lawsuits that the Plan Administrator might file.

Under the Plan, the Plan Administrator will pay or reserve for all administrative claims and other priority claims.  Then the Plan Administrator will make an initial distribution to holders of allowed general unsecured claims, while reserving sufficient cash to pay an equivalent dividend to holders of disputed claims pending resolution of such claims.  At such times as there is additional cash generated by the Plan Administrator through liquidation of non-cash assets (*i.e*, causes of action) or reserved cash is made available through disallowance of disputed claims, and in any event at such time as all claims are resolved and the bankruptcy estate fully administered, the Plan Administrator will make a final distribution to holders of allowed general unsecured claims.  For a discussion regarding allowance of claims, see Section VI below.

### 4.      Subordinated Claims

As noted above, the Committee has informed the Debtor that it is investigating the possibility that certain general unsecured claims may be subordinated under Section 510(a) of the Bankruptcy Code.  The basis for such subordination has yet to be identified, and the Committee's investigations may be continued by the Plan Committee.  Any claims that are subordinated by order of the Bankruptcy Court, by agreement, or otherwise, will classified in Class 6 under the Plan.  Holders of claims in Class 6, if any, will receive a pro-rata distribution of any funds remaining after payment in full of all general unsecured claims in Class 5; it is therefore extremely unlikely that payments will be made to the holders of claims in Class 6.

### 5.      Equity Interests

Equity interests in the Debtor are classified in Class 7 under the Plan.  Class 7 includes the Debtor's common stock and related rights and claims.  It appears to be impossible for the proceeds from the liquidation of the Debtor's assets, once complete, to yield more than a 100 percent recovery to creditors.  Therefore, the Plan provides for that the holders of equity interests in the Debtor (*i.e.*, common stock) will receive nothing on account of such interests, although the holders will retain their equity interests, subject to the Plan.  Accordingly, while there will be no distribution to holders of Class Seven Interests under the Plan, the retention of the equity interests leaves Class Seven unimpaired and Class Seven is thus deemed to accept the Plan.

### D.      PLAN ADMINISTRATOR AND PLAN COMMITTEE

On the Effective Date of the Plan, Jamie Spencer, who has served as Chief Financial Officer during the case, will be deemed appointed as the Plan Administrator and in that capacity will assume possession and control of all property of the Debtor's bankruptcy estate.  The Debtor believes that the continuity provided by Mr. Spencer's serving as Plan Administrator will facilitate the implementation of the Plan and the ultimate resolution of this case.  The Plan Administrator will administer the assets of the estate and ultimately dispose of such assets in accordance with the Plan.  Following confirmation of the Plan, the Plan Administrator shall serve as the representative of the Debtor's bankruptcy estate pursuant to Section 1123(b)(3)(B) of the Bankruptcy Code.  An independent fiduciary, the Plan Administrator will make distributions to

holders of Allowed Claims.  To the extent that objections to the allowance of Claims are not resolved by the Debtor prior to the Effective Date, the Plan Administrator will resolve, either by compromise or through proceedings in the Bankruptcy Court, such objections.  Objections, if any, to Claims held by insiders of the Debtor may also be pursued by the Plan Committee.

The Plan Committee is charged with pursuing causes of action against third parties, including claims arising under Sections 542 through 550 and 553 of the Bankruptcy Code; any proceeds of such actions shall be paid over to the Plan Administrator for distribution to  holders of Allowed Claims as provided in the Plan.  Both the Plan Administrator and the Plan Committee will have the authority to engage professional persons (such as lawyers or accountants) including, in their  discretion, professional persons who have previously served the Debtor's estate. As noted above, Gary Weiner will serve as the Plan Committee's counsel.  The Plan Administrator (and professionals employed by the Plan Administrator and the Plan Committee) will be entitled to reasonable compensation and reimbursement of customary expenses as provided in the Plan; members of the Plan Committee will also be entitled to reimbursement of their expenses incurred while serving in that role.  The Plan Administrator will be protected from liability as set forth in the Plan.  The Plan administrator will also be responsible for filing on behalf of the Debtor's estate any and all federal, state and local tax returns required to be filed by the Debtor.

### E.        EXECUTORY CONTRACTS

Incident to its purchase of the Debtor's assets, Triple M agreed to assume certain of the Debtor's executory contracts.  The Debtor will reject all of its remaining contracts, and the Plan provides that all executory contracts and unexpired leases will be deemed to be rejected as of the Effective Date.  Any claim arising with respect to any contract or lease that is to be deemed rejected as of the Effective Date must be the subject of a proof of claim filed with the Bankruptcy Court not later than the Administrative Claims Bar Date or such claim will be forever barred and no distribution will be made on account of such claim pursuant to the Plan.

## VI.    ALLOWANCE OF CLAIMS

The bankruptcy law provides for pre-bankruptcy claims to be asserted in two ways.  First, a creditor may file a proof of claim with the Bankruptcy Court on the appropriate official form.  Notice was mailed to all known creditors of the Debtor stating that, except for certain types of claims specified in the notice, a deadline of January 15, 2021 (the "Bar Date") was established for filing proofs of claim.  Second, a creditor is excused from the requirement of filing a proof a claim if the creditor's claim is listed in the schedule of liabilities filed by the Chapter 11 debtor with the Bankruptcy Court and is not listed therein as an obligation that is disputed, unliquidated or contingent.

As noted above, Schedule 6.1 of the Plan sets forth a schedule of all of the Residency Claims, and the amount that the Debtor and the Committee believe is the correct amount of each

19

such Residency Claim.  In the absence of an objection to the Plan filed by any of the holders of the Residency Claims listed on Schedule 6.1 of the plan, each Residency Claim shall be deemed allowed in the amount set forth on the Schedule.

Once a claim has been properly asserted, it will automatically be allowed unless an objection is timely filed by an interested party.  If an objection is filed to your claim, you will be sent a copy of the objection.  You will have an opportunity to submit a reply and, if appropriate, to be heard by the Bankruptcy Court.  The Plan provides that no distribution will be made on account of any disputed claim until the dispute is resolved.

In general, bankruptcy courts strictly enforce deadlines for the assertion of claims. Therefore, if you were required to file a proof of claim by the Bar Date but failed to do so, your claim will be disallowed and will not be paid even if the claim would otherwise have been entitled to payment.  Notwithstanding the foregoing, as noted above, Residency Claims that are not the subject of a timely objection to the Plan by the holder of any such Residency Claim shall be deemed allowed in the amount set forth on Schedule 6.1 of the Plan.

In order to ensure that there are funds available to pay any holder of a claim to which an objection is filed, the Plan provides for the Plan Administrator to hold in reserve the *pro rata* amount to which such holder would be entitled if its claim were allowed in the full amount asserted.  If a claim to which an objection has been filed is allowed by the Court, the holder will receive the amount to which it is entitled.  If the claim is allowed in a reduced amount or disallowed, then the reserved funds not necessary to pay the claim will go back into the pool of funds available for distribution to holders of allowed general unsecured claims.

Any creditor whose claim is contingent, unliquidated, or disputed will not receive any distribution until such claim is resolved through the claims objection procedure.  The Bankruptcy Code provides that any party in interest may file a request that the Bankruptcy Court estimate for purposes of distribution the amount of any contingent or unliquidated claim, if liquidation of the claim would unduly delay administration of the case.  A distribution reserve for each such contingent, unliquidated, or disputed claim will be based solely on the amount, if any, determined by the order resolving the request for estimation, or by agreement between the Debtor (or the Plan Administrator, as may be appropriate) and the holder of the contingent, unliquidated or disputed claim.

Any claim arising *during the Chapter 11 case* through the Effective Date and still outstanding as of 30 days after the Effective Date will not be allowed unless it is the subject of a proof of claim (or, in the case of a professional person, an application for compensation) filed with the Court on or before such 30th day (the "Administrative Claims Bar Date").  Such claim will be allowed in full, unless it is objected to within 30 days after the Administrative Claims Bar Date (or such later date as the Bankruptcy Court may determine), except that applications of professionals for compensation shall be allowed only by order of the Bankruptcy Court.

## VII.  ALTERNATIVES TO THE PLAN

The Debtor has ceased all business operations and liquidated virtually all of its assets other than causes of action.  There is no alternative to the Plan that would envision the continuation of the Debtor as an ongoing business.  Since there is no alternative to liquidation, the Plan embodies what the Debtor considers to be the best method of completing the orderly liquidation of the Debtor.

## VIII.  ACCEPTANCE AND CONFIRMATION OF THE PLAN

### A.      ACCEPTANCE OF THE PLAN

The Bankruptcy Code provides that any class of creditors or equity security holders whose rights are "impaired" (in general terms, not fully honored) under a proposed plan of reorganization has the right to vote, as a class, to accept or reject the plan.  A class of creditors accepts a plan if more than one-half of the ballots that are timely received from members of the class, representing at least two-thirds of the dollar amount of claims for which ballots are timely received, are cast in favor of the plan.  If a plan impairs any class of claims, then at least one class of claims must vote to accept the plan in order for it to be confirmed.

The Plan creates two impaired classes of claims: Class Five, which includes all general unsecured claims, and Class Six, which includes any claims that the Court determines should be subordinated in right of payment to general unsecured claims, or which are subordinated by agreement with the holders of such claims.  **The Plan can be confirmed <u>only</u> if at least one of Class Five or Class Six votes to accept the Plan**.

### B.  VOTING PROCEDURES

Included (for creditors holding Class Five Claims or Class Six Claims) in the same envelope containing this Disclosure Statement is a ballot by which you may vote to accept or reject the Plan.  Instructions for completing and returning the ballot are found on the ballot itself. Each Class Five and Class Six creditor should first review this Disclosure Statement and the Plan and then complete the ballot.

All votes to accept or reject the Plan must be cast by using the ballot provided, or a copy of the ballot provided.  The ballot must be signed by the creditor, or an officer, partner or authorized agent of the creditor.  Ballots signed by trustees, executors, administrators, guardians, attorneys-in-fact, officers of corporations or others acting in a fiduciary or representative capacity should indicate such capacity and be accompanied by proper evidence satisfactory to the Debtor of their authority to so act.  Please be sure to fill in the name of the creditor on whose behalf the ballot is being filed.

21

**Only original signed ballots will be effective.  Submission of ballots by fax or other electronic means is not permitted**.

Completed and signed ballots must be returned to the counsel to the Debtor at the following address:

> Michael J. Goldberg, Esq.
> Casner & Edwards, LLP
> 303 Congress Street
> Boston, MA  02210

**Ballots should be returned as soon as possible, and in any event must be returned so that they are actually received by 5:00 p.m. (Boston time) on _____, 2021.** Ballots received thereafter, or ballots not conforming to the requirements set forth above, will not be counted.  Any ballot received which does not indicate either an acceptance or rejection of the Plan shall be deemed to constitute an invalid ballot.

Any vote to accept or reject the Plan cast with respect to any Claim to which an objection has been filed will not be counted for purposes of determining whether the Plan has been accepted or rejected, unless the Bankruptcy Court orders otherwise.  In addition, a creditor's vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that the creditor's acceptance or rejection of the Plan was not in good faith or was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

On each ballot there is a space in which you may write the amount you believe is the amount of your Claim.  If the amount you fill in is different from the "official amount" of your claim as shown in the proof of claim you have filed with the Bankruptcy Court or (if you did not file a proof of claim) the amount shown in the schedule of liabilities filed by the Debtor, then the official amount is the dollar amount for which your vote will be counted.  **THE AMOUNT OF THE CLAIM SPECIFIED ON YOUR BALLOT WILL NOT SUPERSEDE OR AMEND ANY PROOF OF CLAIM FILED WITH RESPECT TO YOUR CLAIM.  IN ADDITION, THE DEBTOR RESERVES ALL RIGHTS IT MAY HAVE TO OBJECT TO YOUR CLAIM OR TO THE VOTING OF YOUR CLAIM**.

### C.  CONFIRMATION OF THE PLAN

The Bankruptcy Court must hold a confirmation hearing before deciding whether to confirm the Plan.  Once confirmed, the Plan will become effective on the second business day following the 14th day after the date of entry of the Bankruptcy Court's order confirming the Plan, provided that the confirmation order has not been stayed.

A hearing on confirmation of the Plan, and on any objections to the Plan, will be held on _____, 2021 at _____ __.m., before the Honorable Elizabeth D. Katz, United

States Bankruptcy Judge, United States Bankruptcy Court, United States Courthouse, 300 State Street, Springfield, Massachusetts.  The confirmation hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement made at the confirmation hearing or any adjournment of that hearing.  Any creditor or other party in interest who wishes to object to confirmation of the Plan must file a written objection with the Office of the Clerk, United States Bankruptcy Court, United States Courthouse, 300 State Street, Springfield, MA 01105, and serve a copy of the objection on:

|  |  |
|---|---|
| Counsel to the Debtor: | Michael J. Goldberg, Esq. |
|  | Casner & Edwards, LLP |
|  | 303 Congress Street |
|  | Boston, MA  02210 |
|  |  |
| Counsel to the Creditors' Committee: | Gary M. Weiner, Esq. |
|  | Weiner Law Firm, P.C. |
|  | 1441 Main Street, Suite 610 |
|  | Springfield, MA 01103 |
|  |  |
| United States Trustee: | Office of the United States Trustee |
|  | Attn: Lisa D. Tingue, Esq. |
|  | 446 Main Street, 14th Floor |
|  | Worcester, MA  01608 |

Objections must filed and served by not later than 5:00 p.m. on _____, 2021.  In order to preserve an objection, anyone filing an objection to confirmation must also attend the hearing on confirmation, either in person or through counsel, except that a corporation may appear only through counsel.  Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of a plan.  Objections to confirmation of the Plan are governed by Rule 9014 of the Federal Rules of Bankruptcy Procedure.  **UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT WILL NOT BE CONSIDERED BY THE BANKRUPTCY COURT**.

At the confirmation hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements for confirmation listed in Section 1129 of the Bankruptcy Code.  As noted, one of the requirements for confirmation is that the Plan must be accepted by either Class Five or Class Six Claims.  Other requirements for plan confirmation include:

- If any creditor does not accept the Plan, the Bankruptcy Court must determine that the Plan provides such creditor with at least as great a distribution as the creditor would receive in a Chapter 7 liquidation.  The Debtor believes that this requirement has been met because the Plan provides for the Debtor's assets to

be liquidated on terms at least as favorable as could be obtained by a Chapter 7 trustee.

- The Bankruptcy Court must determine that confirmation of the Plan is not likely to be followed by the need for liquidation (except as contemplated by the Plan) or further reorganization.  The Debtor believes that this requirement is met because the Plan expressly provides for liquidation of the Debtor.

If the Bankruptcy Court determines that all confirmation requirements are satisfied, it will enter an order confirming the Plan.  The Debtor believes that, so long as Class Five or Class Six votes to accept the Plan, all other confirmation requirements will be satisfied and that the Bankruptcy Court will confirm the Plan.

## IX.  CONCLUSION AND RECOMMENDATION

The Debtor and the Committee believe that the Plan provides general unsecured creditors of the Debtor with the maximum possible dividend on their claims under the circumstances of this case.  **Accordingly, the Debtor and the Committee urge you to vote to accept the Plan**.


Dated: _____, 2021          GKS CORPORATION,



                                      By:_____
                                      Name: Toby Shea
                                      Title: Chief Restructuring Officer



                                      OFFICIAL COMMITTEE OF UNSECURED
                                      CREDITORS



                                      By:_____
                                      Name: Tilia J. Fantasia
                                      Title: Chair, Official Committee of
                                      Unsecured Creditors

24